Nelsoh, J.,
delivered the opinion of the Court.
The plaintiff sued the defendant, in trespass on the cáse, to recover the value of a horse taken and converted by him, and proved, on the trial in the Court below, that he was the owner of the horse, and had left him with one Eckle, to be delivered to Captain Sharp for safe keeping, in the fall of 1863; that in a short time afterward, some persons, dressed as Federal soldiers, came in the night, and alleging that the horse had been used by the plaintiff, in the rebel service, took him away; that he was subsequently found in possession of defendant, who refused to deliver him to Eckle, the agent of the plaintiff, “ saying that the horse had been left there by a soldier, and that he had agreed with the soldier, that he, the defendant, was to have the horse at a certain price, .if he chose to give it; otherwise, the soldier was to pay him for keeping the horse. Defendant said he would not give up the horse, that there was money in the horse. Witness told defendant that the horse was the property of plaintiff, and that if he hept him, it might give him some trouble. Defendant said he would risk that, and that plaintiff, being a rebel, could not own any property. It was not clearly proved, but may, perhaps, be inferred from the testimony, that plaintiff was a rebel, *230 and originally bought the horse for the purpose of using him in the rebel service, and .rode him for a short time, as a conscript in that service. On the trial, his Honor, the Circuit Judge, instructed the Jury, among other things, “that if the plaintiff had used the horse in the rebel service, against the United States Government, in the late civil war, the horse became contraband of war, and became and was subject to capture. A private soldier • of the United States, without any special order, can make a capture of any property contraband of war, and it is the law, that, when the property of one contending force is captured, it becomes the property of the captors; that is, it vests in the United States, if it is property contraband of war, but if it be not property contraband of war, but only forfeited because of some act of the owner, then, there must be a decree, or condemnation, and divestiture and vestiture of property before the forfeiture is complete.” Under this charge, the jury found for the defendant, and the plaintiff, failing to obtain a new trial, filed .his bill of exceptions and prosecuted his appeal to this Court; and in the opinion of this Court, there is error in the proceedings in the Court below.
There is no proof in the record to show that defendant was a soldier, or that the persons who took the horse out of Eckle’s custody, were soldiers, except that they claimed to be soldiers, and were dressed as such. It is not shown to whose command they belonged, or claimed to belong, or that they acted, or. claimed to act, under the orders of any superior officer; and the fact is well-known, that during the late war, and for some time after *231 its close, depreciations upon private property, and personal outrages of tlie most atrocious character were perpetrated by .bandits and desperadoes, the outlaws of both armies, wlio, in the guise of soldiers, often plundered and murdered the peaceful inhabitants of the country. These outrages were of such general and frequent occurrence, that the Legislature, in May, 1865, passed An Act to punish armed prowlers, guerillas, brigands and highway robbers, with death. "We are not aware that, either by the laws of nations, or the laws of war, the doctrine can' be maintained that “a private soldier of the United States, without any special order, can make a capture of any property, contraband of war.” Suck a doctrine, if maintained and enforced, would subject peaceful citizens to the most tyrannical visitations, searches and exactions of the soldiers, and destroy every vestige of private rights and personal security. It would subject the inhabitants to the iron will of armed and lawless power, and confer upon the soldier the unlimited discretion to regard, as contraband of war, every article of property that might please his fancy, or stimulate his avarice. It would make him a judge, juror and executioner, according to his own capricious, vindictive and arbitrary will, and bring the people into the most slavish, degrading and intolerable submission. Whatever may have been the practice of the armies in our civil war, such a doctrine is-contrary to the spirit of our institutions, and can not, in the view of the law, be tolerated, for one moment, by the slightest.sanction or encouragement. In 1 Kent’s Com., 91 m., it is said that “there is a marked difference in the rights of war, carried • on by land and at sea. The *232 object of a maritime war, is the destruction of the enemy’s commerce and navigation, in order to weaken and destroy the foundation of his naval power. The capture or destruction of private property is essential to- that end. But there are great limitations imposed upon' the operations of war by land, though depredations upon private property, and despoiling and plundering the enemy’s territory, are still too prevalent. The term capture, is generally applied to the taking of property by one belligerent from another, at sea, and booty, to the seizure of personal property by a public enemy on land; the proceeds of the former, when duly passed upon and condemned as prize, being distributed among the captors, while the latter belongs exclusively to the Government. But, in the acquisition of booty, a private soldier can not act without the general or special orders of an officer, and when he seizes property, and the lawfulness of his acts is called in question, the legality of the seizure is not to be presumed, but must be proved, as any other matter of justification.
In regard to officers themselves, it is well said that “the evils resulting from irregular requisitions, ■ and foraging for the ordinary supplies of an army, are so very great, and so generally admitted, that it has become a recognized maxim of war, that the commanding officer who permits indiscriminate pillage, and allows the taking of private property, without a strict accountability, whether he be engaged in offensive or defensive operations, fails in his duty to his own government, and violates the usages of modern warfare.” Halleck’s Int. Law & Laws of War, p. 461, § 18. And in regard to soldiers, the law was *233 correctly stated more than a century ago, by one of the ablest and most philosophic of authors, on the law of nations, as follows: “Soldiers can undertake nothing without the express or tacit command of their officers. To obey and execute is their province — not to act at their own discretion; they are only instruments in the hands of their commanders. Let it be remembered here, that, by a tacit order, I mean one which is necessarily included in an express order, or in the functions with which a' person is intrusted by his superior. What is said of soldiers, must also, in a proper degree, be understood of officers, and of all who have any subordinate command. "Wherefore, with respect to things which are not intrusted to their charge, they may both be considered as private individuals, who are not to undertake anything without orders. The obligation of the military is even more strict, as the marshal law expressly forbids acting without orders, and this discipline is so necessary, that it scarcely leaves any room for presumption. In war, an enterprise which wears a very advantageous appearance, and promises almost certain success, may, nevertheless, be attended with fatal consequences. It would be dangerous in such a case, to leave the decision to the judgment of men in subordinate stations, who are not acquainted with all the views of their General, and who do not possess an equal degree of knowledge and experience; it is therefore not to be presumed that he intends to let them act at their own discretion.”
“'Fighting without, orders is almost always considered, in a military man, as fighting contrary to orders, or contrary to prohibition. There is, therefore, hardly any *234 ease, except that of self-defense, in which soldiers and inferior officers may act without orders." Vat. Law of Nations, Bk. III., ch. XV., § 230, pp. 400, 401. These views are substantially embodied in the articles of war, prescribed by the Act of 1806, ch. 20, 2 U. S. Stat. at Large, 359-372. So stringent are these regulations, that, by Article 52, any soldier who, before the enemy, quits his post or colors to plunder or pillage, may, upon conviction, be punished with death; and it is not to be supposed that the laws of the United States permit plunder or pillage, at the discretion of soldiers, at any time.
The law on this subject, was, in our opinion, stated correctly by the Court of Appeals of Kentucky, in Lewis v. McGuire, 3 Bush Kentucky Rep., 203, 204. In that case it is said, that, “Neither the right of impressment nor the right to exact military contributions, belongs to every petty military officer, but must come from the commander of a district of country, or a postj or an army, and not from every straggling squad who may be under the command of some inferior officer of low grade. Nor, indeed, will either the commission or capacity in which an officer professes to act, fix his status, but the manner of his conduct; for, even a regularly commissioned officer, in the regular military service of a belligerent, may be guilty of such a line of conduct as to show he, in reality, belonged to an irregular, irresponsible plundering service, which can not be shielded by a regular commission." Adopting this view as to the powers, duties and liabilities of officers, we, of course, hold that too wide a latitude was given, in the charge *235 of the Circuit Court, to those of the common soldier, and that the opinion of his Honor, that “a private soldier of the United States, without any special order, can make a capture of any property contraband of war,” is not warranted by the laws of the United States, the laws of war, or the law of nations.
Reverse the judgment.